## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PAMELA SMOCK,

                Plaintiff,                Case No. 2:18-cv- 10407-AJT-APP

v.                                Hon. Arthur J. Tarnow

MARK SCHLISSEL,
REGENTS OF THE UNIVERSITY OF MICHIGAN,
and ANDREW MARTIN,
in their individual and official capacities,
and MARTIN PHILBERT,
in his official capacity.

        Defendants.

_____

| | |
|---|---|
| David A. Nacht (P47034) | UNIVERSITY OF MICHIGAN |
| Charlotte Croson (P56589) | Office of the Vice President |
| Adam M. Taub (P78334) | & General Counse1 |
| NACHTLAW, P.C. | David J. Masson (P37094) |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 101 North Main St., Suite 555 | 503 Thompson Street, Room 5010 |
| Ann Arbor, MI  48104 | Ann Arbor, MI 48108-1340 |
| (734) 663-7550 | (734)764-0304 |
| dnacht@nachtlaw.com | dmasson@umich.edu |
| ataub@nachtlaw.com | |

_____

## AMENDED COMPLAINT AND JURY DEMAND

      Plaintiff, Pamela Smock, by and through her attorneys, NACHTLAW, P.C.,

hereby alleges as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff, Pamela Smock, is a tenured Professor of Sociology in the College of Literature, Science and the Arts ("LSA") at the University of Michigan ("University" or "UM"), Ann Arbor.

2.      UM is a public entity created under the Constitution of the State of Michigan.

3.      Plaintiff has worked for UM for about twenty-three (23) years and has mentored about fifty (50) students.

4.      Prior to the events described below, Plaintiff had never received any discipline or had any complaints filed against her while employed at UM.

5.      Plaintiff has been involved in a number of campus activities associated with mentorship, authored mentorship handbooks for the University, and has received an award for her teaching.

6.      The events at issue occurred in Ann Arbor, Michigan, which lies in Washtenaw County and the Eastern District of Michigan.

7.      Defendant Andrew Martin is Dean and the Chief Administrative Official of LSA at UM. He reports to the Provost of the University, Defendant Martin Philbert, who in turn reports to the President, Defendant Mark Schlissel. The President is appointed by Defendant, Regents of the University of Michigan.

8.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff brings her claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

9.     Venue is proper in this Court because Defendants obligated themselves to Plaintiff within the Eastern District of Michigan, the University is located within the Eastern District of Michigan, Plaintiff resides within the Eastern District of Michigan, and, upon information and belief, Defendants reside within the Eastern District of Michigan.

## GENERAL ALLEGATIONS

### A.    Background

10.    The Regents have directed that the President, Defendant Schlissel investigate acts of discrimination and harassment in violation of federal and state laws.

11.    The President has maintained a previously-established office, the Office of Institutional Equity ("OIE") to perform that function.

12.    OIE has a staff of investigators.

13.    OIE has repeatedly changed its approach to investigations regarding allegations of discrimination or harassment against faculty members.

14.    Faculty members at UM have rights protected under the First Amendment to discuss ideas with graduate students.

3

15.     Graduate students have rights to be free of a sexually hostile educational environment.

16.     Because professors sometimes discuss issues that relate to the subjects of sex and/or gender and because ideas or thoughts are inherently capable of causing offense, UM, and its key administrative leadership should establish a minimum threshold of credible evidence of a Title IX, Title VII or Elliot-Larsen violation prior to initiating investigations of professors for engaging in offensive speech.

17.     Otherwise, professors can be chilled in the exercise of their free speech rights.

18.     The existence of the possibility of an investigation is sufficient to chill First Amendment speech.

19.     Whatever the requirements are of civil rights laws for the University to engage in prompt and thorough investigations, the University cannot do so at the expense of transmission of ideas and development of knowledge.

20.     The very reason for tenure is to protect faculty from becoming intimidated or chilled from thinking, speaking and teaching as they see fit.

21.     OIE claims to have preliminary review before initiating investigations of faculty.

22.     In practice, a graduate student or colleague can make allegations of offensive speech and trigger an investigation.

4

23.     OIE investigations typically last months, and a prudent respondent will hire counsel to defend at his or her own expense.

24.     While under investigation, a professor is subject to warning not to retaliate. This admonition is designed to chill speech and conduct to protect complainants.

**B.     Plaintiff's OIE Investigation**

25.     In the case at issue, Plaintiff supervised three female graduate students who were close friends.

26.     They worked as a team on research and held weekly meetings over a multi-year period.

27.     It is integral to Plaintiff's work that she supervises and interacts with graduate students.

28.     Plaintiff is a social demographer and family sociologist within the University's Sociology Department.

29.     She has also been a member of the doctoral preliminary examinations committee in the Gender and Sexuality subarea in the Department of Sociology.

30.     As a social demographer and family sociologist, Plaintiff studies an array of topics relating to families, fertility, childbearing, intimate relationships, sexuality, and gender.

31.     The graduate students Plaintiff supervised studied the same topics.

32.     Shortly after Plaintiff raised questions about the integrity of one of the student's work, in or about April 2016, the students approached the Department Chair and OIE with multiple allegations concerning Plaintiff's alleged misconduct.

33.     The allegations included a false allegation that Plaintiff maintained a firearm in her office.

34.     The UM Department of Public Safety conducted a search of Plaintiff's office and found no weapon.

35.     The allegations also included alleged conversations of a sexual nature that Plaintiff would have with her graduate students.

36.     After the search for the non-existent firearm, the OIE conducted an investigation that lasted about eight (8) months.

37.     Per current UM and OIE practice, Plaintiff had no opportunity to cross-examine witnesses, including but not limited to her accusers, or to engage in discovery.

38.     Plaintiff denied, and continues to deny, many of the allegations made against her.

39.     Plaintiff offered to provide statements of former graduate students, but OIE deemed such testimony irrelevant.

40.     The alleged statements that gave rise to the investigation included a handful of jokes over a multi-year period.

6

41.     The allegations also included academic conversation of sexual topics.

42.     Plaintiff's accusers admitted that they never told her to stop, and at least one of the accusers admitted that she did not find Plaintiff's conduct inappropriate.

43.     Section 10 of the "University of Michigan Policy and Procedures on Student Sexual and Gender-Based Misconduct and Other Forms of Interpersonal Violence" states that the Title IX coordinator performs "an initial assessment." Because of the assessment, the Title IX coordinator determines the University's Title IX "obligation to investigate or otherwise determine what happened."

44.     The policy does not determine any standards by which the Title IX Coordinator acts to perform that initial assessment. Following the assessment, OIE can choose to perform a formal resolution, an alternative resolution, or additional remedies. In the case of Professor Smock, the Title IX Coordinator chose to pursue a formal resolution.

45.     The policy allows for the claimant to seek a review panel for alternatives to formal resolution. The policy does not allow for respondents to go to the review panel prior to the initiation of an investigation. In this particular case, the Title IX Coordinator chose to pursue an investigation.

46.     On or about December 16, 2016, The OIE investigation concluded that Plaintiff's conduct was not sufficiently severe, persistent, or pervasive enough to create a sexually hostile environment.

47.    Even though it was outside the scope of OIE's jurisdiction, however, the investigation still concluded that Plaintiff's conduct was "inappropriate."

48.    The OIE investigation made no determination regarding witness credibility issues even though Plaintiff repeatedly called her accuser's credibility into question.

49.    Plaintiff also repeatedly pointed out that her accusers had told a blatant lie about an alleged firearm in her office and that they had a motive to lie (i.e. Plaintiff's accusation that one of her accusers had possibly committed academic misconduct).

50.    Plaintiff raised other facts disputing the allegations against her that were not made part of the OIE investigation report.

## C.    Defendant Martin Sanctions Plaintiff

51.    On or about February 1, 2017, Defendant Martin sent Plaintiff a letter regarding the OIE investigation.

52.    Defendant Martin stated that he found the report "troubling" and that there was "evidence that [Plaintiff] failed to maintain professional boundaries with students."

53.    The letter also informed Plaintiff that she faced possible sanctions and that she could "submit a document including any additional information" for consideration regarding the sanctions.

54.    The letter failed to state any specific sanction that Plaintiff could face.

55.    The letter failed to identify any alleged University policy Plaintiff could be sanctioned under.

56.    The letter also failed to provide the specific evidence from the report that Defendant Martin found troubling.

57.    Under UM's own policy, an OIE investigation may be referred to a "Department" for follow-up if inappropriate behavior is found.

58.    Here, instead of referring the matter to Plaintiff's Department (Sociology), OIE referred the matter directly to Defendant Martin, the head of LSA.

59.    Furthermore, Plaintiff was *never* given the opportunity to meet with Defendant Martin to explain her side of the story in-person.

60.    Plaintiff was only offered the opportunity to provide a document with additional information for Defendant Martin to consider.

61.    Plaintiff did provide additional documentation but did not understand Defendant Martin's allegations against her.

62.    Had Defendant Martin explained the specific behavior in the OIE investigation that he found "troubling," Plaintiff would have addressed it through additional documentation.

63.    On or about March 31, 2017, Defendant Martin sent Plaintiff another letter regarding the OIE investigation.

9

64.     Defendant Martin wrote that although Plaintiff had been cleared of creating a sexually hostile work environment, he still found her behavior "inappropriate, unprofessional, and has had the effect of interfering with students' opportunity to study and learn."

65.     There was no finding in the OIE report that Plaintiff's conduct had interfered with any student's opportunity to study and learn.

66.     Nonetheless, as a result of Defendant Martin's findings, Plaintiff was sanctioned for three years (until September 2020) by:

a.   Having her salary frozen at her academic year 2016-17 wage;

b.   Removing any opportunity for approved sabbatical leave or accumulation of sabbatical equity;

c.   Refusing to allow her to serve as the sole or primary advisor for doctoral students until at least Winter Term 2020 (the Department Chair and Associate Dean will review the arrangement at that time); and

d.   Preventing her from meeting with graduate students outside of professional settings (e.g. off campus in Ann Arbor, or off-site social events at professional meetings).

67.     Tenured professors are entitled to consideration for annual merit increases in their salaries.

68.     Tenured professors who have completed six years of service are entitled to apply for sabbatical leave.

69.     Only leaves of absence without pay are not considered when determining years of service applicable toward the sabbatical eligibility requirement.

70.     A copy of Defendant Martin's letter and the OEI investigation report were placed in Plaintiff's personnel file.

71.     Defendant Martin's letter did not provide *any* University policy that Plaintiff's alleged conduct violated.

72.     Plaintiff was given no prior notice that Defendant Martin was considering the specific sanctions levied against her.

73.     Defendant Martin failed to provide Plaintiff an opportunity to respond to the allegation that she "had the effect of interfering with students' opportunity to study and learn" prior to sanctioning her.

74.     Defendant Martin failed to state the specific conduct he found to have "the effect of interfering with students' opportunity to study and learn" before or at the time he sanctioned Plaintiff.

75.     Defendant Martin failed to provide Plaintiff notice of the University policy she allegedly violated prior to sanctioning her.

76.     Defendant Martin failed to provide Plaintiff *any* opportunity to discuss the allegations against her with him before he sanctioned her.

11

### D.   Sham Grievance Proceeding

77.   Following Defendant Martin's March 2017 sanctions, Plaintiff filed a faculty grievance application on or about April 19, 2017 challenging the sanctions per the University's policy.

78.   Plaintiff filed her written grievance with UM on or about June 30, 2017.

79.   The grievance was heard on or about September 9, 2017 in front of the Grievance Hearing Board ("GHB").

80.   None of the OIE witnesses or accusers testified, and Plaintiff had no opportunity to cross-examine them.

81.   At the hearing, for the first time, UM argued that Plaintiff's conduct violated its policy, Standard Practice Guide ("SPG") 201.96.

82.   This SPG provision states:

The following types of behaviors may be subject to professional sanction, including discipline up to and including dismissal in accordance with the appropriate procedures.

These behaviors include oral, written, visual, or physical actions by a member of the faculty that, according to a reasonable person standard:

a) Have the purpose or effect of unreasonably interfering with an individual's employment or educational performance; and/or

b) Have the purpose or effect of creating an intimidating, hostile, offensive or abusive climate for an individual's employment, academic pursuits, living environment, or participation in a University activity.

Some examples of conduct that may violate this policy include, but are not limited to:  threatening behavior, actions, or comments; bullying behavior (defined as a persistent pattern of negative behavior based upon a real or perceived power or status imbalance which belittles another member of a unit); undue interference with functions or activities sponsored or authorized by the University; forcible detention, threats of physical harm to, or harassment of another member of the University community;  and behavior that results in a hostile  working or learning environment.  This list is not exhaustive, and faculty may be subject to sanction and disciplinary action for any type of conduct which, although not specifically enumerated, meets the standard for unacceptable faculty behavior set forth above under a) or b).

83.     On information and belief, SPG 201.96 is approved by the office of the Provost and Executive Vice President for Academic Affairs, Defendant Philbert, and University Human Resources.

84.     UM claimed that Plaintiff violated SPG 201.96 by:

a.  Sharing a student's information with another student, as well as with a faculty member from another university;

b.  Entering her students' hotel room and engaging in behavior that students reasonably found frightening;

c.  Using time in research meetings on more than one occasion to discuss her own sexual activities; and

d.  Asking a student and her spouse for personal favors.

85.     The allegations are untrue.

86.     Plaintiff has categorically denied each of them.

13

87.     Plaintiff maintains that she was using reasonable care in sharing her concerns that a student may have committed academic misconduct prior to a discussion with the Graduate Director.

88.     Plaintiff maintains that she did not exercise the best judgment when entering her students' hotel room, but it was only one incident, and prior to the OIE investigation, she had a close and friendly relationship with the students. The students were aware that Plaintiff was making a joke in reference to the movie *The Shining* and were not reasonably frightened by the joke.

89.     Plaintiff maintains that any discussion of sexual activities was a discussion between feminist colleagues in an academic setting, and that she would not normally talk about her own sexual activity.

90.     Plaintiff is only aware of one allegation regarding her asking for a "personal favor," and maintains that asking a student's spouse for help backing out of a parking space is not sanctionable conduct.

91.     The GHB released its decision on or about November 13, 2017.

92.     In its decision, the GHB admitted that it could not determine whether Plaintiff's alleged violation of UM policy was commensurate with prior sanctions, as the University did not provide specifics of the violations in other cases.

93.     The GHB also admitted that the fourth sanction—"You are not permitted to meet with graduate students outside of professional settings (e.g. off

14

campus in Ann Arbor, off-site social events at professional meetings)" — was vague and suggested that UM provide Plaintiff with clarification of what contact was permissible or impermissible.

94.     The GHB did not state whether the University's interpretation of this sanction could impact its decision.

95.     UM has yet to provide clarification to Plaintiff regarding this sanction.

96.     Additionally, the GHB admitted that:

Prior to the Executive Committee, the Grievant may have been unclear as to the specific SPG(s) her behavior was to be evaluated. For this reason, ***the Grievant's ability to respond effectively to the invitation to provide a letter in defense of herself prior to the Executive Committee meeting may have been compromised***, because she did not know what specific SPG violations she should defend against. Although the OIE/AFA [Academic and Faculty Affairs] report lists specific behaviors, the report does not mention SPG 201.96. The University of Michigan SPG is by its nature expansive, but this expansiveness makes it difficult to navigate; for example, one GHB member performed a simple <u>keyword search</u> for "inappropriate behavior" in the University's online SPG search bar and this turned up three candidate SPGs, none of which were SPG 201.96.

(emphasis added)

97.     And the GHB admitted:

[U]pon receiving sanctions, the Grievant may have been unclear as to the policies her behavior was compared against and deemed to violate. For this reason, ***the Grievant's ability to respond effectively to the invitation to provide a one-time response to the sanction letter as part of the grievance process may have been compromised***, because she did not know what specific SPG violations she should defend against.

(emphasis added)

98.    Finally, the GHB admitted, "[D]ue process requires that faculty, when facing sanctions threatened or imposed, be given an opportunity to defend their behavior while knowing what specific SPGs their behavior will be or was compared against."

99.    Thus, the GHB recommended that, unlike in this case, faculty should be told in writing, at the time of sanctioning, which specific SPGs or other University policies were allegedly violated. And faculty should be notified of which specific University policies are being considered prior to a meeting to determine sanctions. Essentially, the GHB recommended that faculty should know what University policies were considered before and at the time of sanctioning.

100.    Nonetheless, in its decision, the GHB found that evidence in the OIE report indicated a pattern of behavior by Plaintiff that was sanctionable as "unprofessional" and upheld the sanctions against Plaintiff.

101.    The GHB failed to state any specific instances contained in this alleged "pattern of behavior."

102.    The GHB failed to determine whether the sanctions against Plaintiff were in-line with prior similar cases.

103.    The GHB determined that Plaintiff received due process even though they determined that the process may have been compromised and made

recommendations to follow different procedures than those granted to Plaintiff in future cases.

104.   Plaintiff appealed the GHB's final decision on or about November 29, 2017 to Provost Martin A. Philbert, who upheld the sanctions on or about January 18, 2018.

105.   Plaintiff has been forced to take medical leave for the stress caused by Defendants' unlawful conduct.

106.   Defendants' publicly-known unlawful actions have stigmatized Plaintiff, leading to loss of her reputation, good name, honor, and integrity.

107.   Plaintiff's loss of her reputation, good name, honor, and integrity have resulted in her losing employment opportunities, including but not limited to forcing her to take medical leave.

108.   Her medical leave is being taken pursuant to the advice of her own medical professionals and the University's medical case manager.

## COUNT I
## PROCEDURAL DUE PROCESS

109.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

110.   At all times relevant hereto, as a tenured professor, Plaintiff had a clearly established property right in the terms and conditions of her employment under the 14th Amendment of the U.S. Constitution.

111.   Defendants, acting in their individual and official capacities, at all relevant times herein, including but not limited to their words and actions regarding the OIE investigation, the pre-sanction communications, and the sanction determination deprived Plaintiff of her constitutional clearly established property right to terms and conditions of her employment by denying her an annual merit-based review for wage increases, denying her sabbatical leave or accrual of sabbatical leave, preventing her from performing her job duties by prohibiting her from supervising or interacting with graduate students, falsely accusing her of sexual harassment without legal basis, constructively discharging her employment by forcing her to take medical leave, and otherwise as alleged above.

112.   University Faculty Employee Handbook Section 16.B.1 and SPG 201.30-2 provide that tenured professors who have completed six years of service are entitled to apply for sabbatical leave. And only leaves of absence without pay are not considered when determining years of service applicable toward the sabbatical eligibility requirement. Yet Defendants deprived Plaintiff of these property rights without due process of law.

113.   University Faculty Employee Handbook Section 14.E provides that tenured faculty members are to receive an annual merit-based review for wage increases.

114.   University Faculty Employee Handbook Section 8.A provides:

> ***Teaching is at the core of the mission of the University***, whether it be in the context of undergraduate education, ***mentoring graduate students***, training students in the professional schools, or any of the other myriad ways faculty interact with students, inside and outside the classroom. Our students challenge us to create a rich and diverse learning environment, and they are the lifeblood of the institution. Recognizing that the exceptional students who come to the University of Michigan are one of our most valuable resources***, the University places great emphasis on the teaching role of faculty and strives to provide resources to encourage and facilitate interactions between students and faculty members***.

(emphasis added)

115.   Defendants deprived Plaintiff of her constitutional property right to continued terms and conditions of employment without due process of law, as Plaintiff did not have adequate notice of the charges against her, adequate notice of the evidence used against her, or the ability to cross-examine her accusers.

116.   In fact, the GHB admitted that the process used to sanction Plaintiff and her ability to adequately respond to the charges against her may have been compromised.

117.   Plaintiff's ability to adequately respond to the charges against her were compromised.

118.   Defendants failed to state the University policy Plaintiff allegedly violated until after she was already sanctioned.

119.   Defendants failed to state the specific evidence it relied on in the OIE investigation report to sanction Plaintiff before or after sanctioning her.

120.   Defendants failed to allow Plaintiff to cross-examine her accusers before or after sanctioning her despite Plaintiff's claims that her accusers' allegations were not credible.

121.   Defendants failed to follow their own procedures in sanctioning Plaintiff.

122.   At all relevant times, Defendants were acting under color of state law.

123.   At all relevant times, Defendants, in their individual and official capacities, were executing official UM policy by making edicts or acts depriving Plaintiff of her constitutional rights, by representing the official policy of UM, by accepting findings that were made in contravention of UM policy regarding such investigations, and by then moving and falsely finding Plaintiff had violated SPG 201.96, which caused her to subsequently be sanctioned.

124.   Subsequently, Defendants, again in their individual and official capacities, executed official UM policy by then moving and sanctioning Plaintiff and forcing her to take medical leave.

125.   Accordingly, Defendants are liable to Plaintiff pursuant to 42 USC § 1983 for their deprivation of Plaintiff's constitutional rights, and damaging her as alleged herein and below.

## COUNT II
## UNCONSTITUTIONAL VAGUENESS AND OVERBREADTH

126.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

127.   As a public employee, Plaintiff had a clearly established due process right under the 14th Amendment to the United States Constitution and a right to free speech under the 1st Amendment, as incorporated by the 14th Amendment against the states, to be sanctioned under policies that do not sanction exercise of free speech and apprise a person of reasonable intelligence of the nature of prohibited conduct.

128.   Otherwise, the policy is unconstitutionally overbroad and/or vague.

129.   Defendants have proffered that Plaintiff was sanctioned under SPG 201.96.

130.   SPG 201.96 provides that faculty members can be sanctioned for certain behaviors:

> These behaviors include oral, written, visual, or physical actions by a member of the faculty that, according to a reasonable person standard:
>
> a)      Have the purpose or effect of unreasonably interfering with an individual's employment or educational performance; and/or
>
> b)      Have the purpose or effect of creating an intimidating, hostile, offensive or abusive climate for an individual's employment, academic pursuits, living environment, or participation in a University activity.
>
> Some examples of conduct that may violate this policy include, but are not limited to:  threatening behavior, actions, or comments; bullying behavior (defined as a persistent pattern of negative behavior based upon a real or perceived power or status imbalance which belittles another member of a unit); undue interference with functions or activities sponsored or authorized by the University; forcible detention,

threats of physical harm to, or harassment of another member of the University community; and behavior that results in a hostile working or learning environment. This list is not exhaustive, and faculty may be subject to sanction and disciplinary action for any type of conduct which, although not specifically enumerated, meets the standard for unacceptable faculty behavior set forth above under a) or b).

131.   Under this policy, activity protected by law, like political speech or academic thought, could be sanctionable.

132.   Under this policy, criticism of a student's work product, even if warranted, could be sanctionable.

133.   Nearly any conduct could be sanctionable under this University policy.

134.   Therefore, a person of reasonable intelligence would not be able to determine the nature of the prohibited conduct.

135.   Therefore, SPG 201.96 is, on its face, unconstitutionally overbroad as it reaches a substantial amount of constitutionally protected speech.

136.   As applied to Plaintiff, SPG 201.96 is unconstitutionally overbroad as Defendants' application and interpretation of SPG 201.96 sanctioned Plaintiff for engaging in constitutionally protected speech, as set forth herein.

137.   SPG 201.96 is, on its face, unconstitutionally vague as it fails to inform a person of reasonable intelligence of the nature of the conduct it prohibits and sanctions.

138.   As applied to Plaintiff, SPG 201.96 is unconstitutionally vague as Defendants' sanctioned Plaintiff for speech and conduct which she could not have

reasonably anticipated would be prohibited by SPG 201.96, including, but not limited to, her engagement in constitutionally protected speech, as set forth herein.

139.   At all relevant times, Defendants were acting under color of state law when sanctioning Plaintiff under this unconstitutionally overbroad and/or vague policy and forcing her to take medical leave.

140.   Defendants, in their individual and official capacities, executed official UM policy by then moving and sanctioning Plaintiff and forcing her to take medical leave under this unconstitutionally overbroad and/or vague policy.

141.   Accordingly, Defendants are liable to Plaintiff pursuant to 42 USC § 1983 for their deprivation of Plaintiff's constitutional rights, and damaging her as alleged herein and below.

## COUNT III
## FREE SPEECH RETALIATION

142.   The First Amendment of the United States Constitution provides for Plaintiff's right to the freedom of speech.

143.   This right is enforceable against Defendants through the 14th Amendment of the United States Constitution.

144.   Congress created a cause of action for a violation of these rights under 42 U.S.C. § 1983.

145.   Plaintiff engaged in protected conduct by speaking regarding a matter of a public concern to her graduate students. The statements were made to further academic

thought and scholarship. Plaintiff is a professor whose research emphasizes gender, relationships, childbearing, cohabitation, divorce, and related issues.  She engaged in feminist-informed conversations of the subject matter with feminist colleagues.

146.   The potential consequences of chilling academic thought and scholarship are severe and well-recognized by courts.

147.   As admitted by her accusers, Plaintiff's speech did not impair the University's ability to operate efficiently and effectively.

148.   Despite her rights being clearly established and recognized by the University, Defendants took adverse action against Plaintiff because of her protected conduct, in that she was sanctioned and forced onto medical leave because of her exercise of her right to freedom of speech.

149.   Defendants' actions will chill Plaintiff and other faculty members' exercise of free speech.

150.   Accordingly, Defendants are liable to Plaintiff pursuant to 42 USC § 1983 for their deprivation of Plaintiff's constitutional rights, and damaging her as alleged herein and below.

## RELIEF REQUESTED

For all of the foregoing reasons, Plaintiff Pamela Smock demands judgment against Defendants as follows:

a.   Declare the practices and actions of Defendants as unconstitutional;

b.   Declare that Standard Practice Guide ("SPG") Section 201.96 is unconstitutionally vague;

c.   Compensatory damages for monetary and non-monetary loss in whatever amount she is found to be entitled;

d.   Exemplary damages in whatever amount she is found to be entitled;

e.   A judgment for lost wages and benefits, past and future, in whatever amount he is found to be entitled;

f.   An order of this Court reversing the sanctions imposed against Plaintiff by Defendants;

g.   An order of this Court removing the OIE investigation and sanctions from Plaintiff's personnel file;

f.   An injunction of this Court prohibiting any further acts by Defendants violating Plaintiff's constitutional rights;

h.   An award of interest, costs and reasonable attorney fees; and

i.   Whatever other relief this Court finds appropriate.

Respectfully Submitted,

NACHTLAW, P.C.

/s/ David A. Nacht
David A. Nacht (P47034)
Adam M. Taub (P78334)
Charlotte Croson (P56589)
Attorneys for Plaintiff
101 N. Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550

Dated: June 22, 2018

25

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PAMELA SMOCK,

        Plaintiff,                Case No. 2:18-cv- 10407-AJT-APP

v.                                 Hon. Arthur J. Tarnow

MARK SCHLISSEL,
REGENTS OF THE UNIVERSITY OF MICHIGAN,
and ANDREW MARTIN,
in their individual and official capacities,
and MARTIN PHILBERT,
in his official capacity.

        Defendants.

_____

| | |
|---|---|
| David A. Nacht (P47034) | UNIVERSITY OF MICHIGAN |
| Charlotte Croson (P56589) | Office of the Vice President |
| Adam M. Taub (P78334) | & General Counse1 |
| NACHTLAW, P.C. | David J. Masson (P37094) |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 101 North Main St., Suite 555 | 503 Thompson Street, Room 5010 |
| Ann Arbor, MI  48104 | Ann Arbor, MI 48108-1340 |
| (734) 663-7550 | (734)764-0304 |
| dnacht@nachtlaw.com | dmasson@umich.edu |
| ataub@nachtlaw.com | |

_____

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, Pamela Smock, by and through her attorneys, NachtLaw, P.C. and hereby demands for a jury trial in the above-captioned matter for all issues so triable.

Respectfully Submitted,

NACHTLAW, P.C.


/s/ David A. Nacht

David A. Nacht (P47034)
Attorney for Plaintiff Pamela Smock
101 N. Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550

Dated: June 22, 2018