UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAMELA SMOCK,

    Plaintiff,

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN, ET AL.,

    Defendants.
_____/

Case No. 18-10407

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
R. STEVEN WHALEN

**ORDER AND OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [17] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [25]**

Plaintiff, Professor Pamela Smock, brings this § 1983 Complaint against the Board of Regents of the University of Michigan, Andrew Martin (Dean of the College of Literature, Science and Arts), Martin Philbert (Provost and Executive Vice President for Academic Affairs) and Mark Schlissel (President). Plaintiff alleges that the Defendants violated her First and Fourteenth Amendment rights when they sanctioned her for alleged misconduct in April of 2017. She pleads that the University of Michigan's proceedings against her under its Standard Practice Guide ("SPG") I) deprived her of due process, II) on the basis of an unconstitutionally overbroad and vague policy, III) to retaliate against her exercise of protected speech. She seeks compensatory, exemplary, and injunctive relief.

## Factual Background

Plaintiff is a tenured Professor of Sociology in the College of Literature, Science, and the Arts ("LSA") at the University of Michigan ("University") in Ann Arbor, Michigan. She, along with graduate students under her supervision, study topics related to family, fertility, gender, demography, and sexuality.

In April 2016, Plaintiff questioned the integrity of one of the student's work. (Compl. ¶ 32). Shortly thereafter, all three students contacted the Chair of the Department of Sociology, as well as UM's Office of Institutional Equity ("OIE"), with information about alleged misconduct by Plaintiff. (Id.). The students claimed that Plaintiff made inappropriate jokes and had conversations of a sexual nature with them. (Id. at ¶¶ 33-35). Plaintiff denies these allegations. (Id. at ¶ 38).

The OIE conducted an eight-month-long investigation of the students' allegations against Plaintiff. At the conclusion of the investigation, in December 2016, the OIE concluded that Plaintiff's conduct, though inappropriate, "was not sufficiently severe, persistent, or pervasive enough to create a sexually hostile environment." (Compl. ¶¶ 46, 47; Defs.' Ex. 1). In February 2017, Defendant Andrew Martin, the Dean and Chief Administrative Official of LSA, told Plaintiff via letter that he found the OIE's investigation report "troubling." (Defs.' Ex. 2). Martin also said that there was "evidence that Plaintiff failed to maintain professional boundaries with students." (Compl. at ¶ 52). Martin told Plaintiff that

she faced possible sanctions and gave her the opportunity to submit additional documentation for consideration. (Id. at ¶ 54). The extent of her submissions is unclear from the record.

At any rate, on March 31, 2017, the LSA Executive Committee sanctioned Plaintiff for three years. Her salary was to be frozen at its 2016-17 rate; she was denied any opportunity for sabbatical leave or the accumulation of sabbatical equity; she was forbidden to serve as the primary advisor of doctoral students; and she was barred from meeting with students outside of professional settings. (Id. at ¶ 56).

Plaintiff filed a faculty grievance application several weeks later. The Grievance Hearing Board ("GHB") heard Plaintiff's grievance on September 9, 2017. At the hearing, the University argued for the first time that Plaintiff had violated its civility policy, SPG 201.96. (Id. at ¶ 81). The University alleged that she violated the SPG by sharing a student's information; entering her students' hotel room and engaging in behavior that they found frightening; discussing her own sexual activities during research meetings with students; and asking a student and the student's spouse for personal favors. (Id. at ¶ 84). The GHB upheld the sanctions on November 13, 2017, concluding that the evidence in the OIE report indicated an unprofesional pattern of behavior by Plaintiff. (Id. at ¶¶ 91-99). On January 18, 2018, Provost Philbert upheld this decision on appeal. (Id. at ¶ 104).

## PROCEDURAL BACKGROUND

Plaintiff filed her first Complaint [Dkt. #1] on February 2, 2018. On June 21, 2018, the Court gave her partial leave to amend her complaint. Before she did so, however, Plaintiff filed a Motion for Summary Judgment [17] on Count II of the pleadings. That motion is now fully briefed and functions as a cross motion to Defendant's Motion to Dismiss. Plaintiff filed her Amended Complaint on June 22, 2018 [23], and on July 20, 2018, Defendants filed a Motion to Dismiss [25] incorporating their old Motion to Dismiss [6]. That motion is now fully briefed too, and a hearing was held on both motions on October 4, 2018.

## LEGAL STANDARD

Defendants move to dismiss the amended complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P 12(b)(6). On a motion to dismiss, the Court must "construe the complaint in a light most favorable" to Plaintiff and "accept all of [its] factual allegations as true." *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). "Although the factual allegations in a complaint need not be detailed, they 'must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief.'" *Id. quoting LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). To survive such a motion, Plaintiff must plead factual content that allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## ANALYSIS

**I.     Procedural Due Process**

Plaintiff alleges that the University's sanctions violated her right to due process. For this claim to be legally cognizable she must plead first that the privileges she was deprived are constitutionally protected, and only then that she was denied the process that was due her. *See Bd. Of Regents v. Roth*, 408 U.S. 564, 576-78 (1972) (holding that a non-tenured professor at a public university had no cause of action where the University decided, without cause, not to renew his annual contract).

*1. Do the University's sanctions against Plaintiff, taken in the light most favorable to Plaintiff, constitute deprivations of Constitutional dimensions?*

First, Plaintiff did not suffer a constructive discharge. To create a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit, and the employee must actually quit. *Moore v. KUKA Welding Systems & Robot Corp*. 171 F.3d 1073, 1080 (6th Cir. 1999). Plaintiff is still employed by the University, so she must prove that she has due process interests in the targets of the sanctions: her pay raises, sabbatical leave, and graduate student advising.

Plaintiff, as a public employee, is owed an adequate pre-deprivation hearing before being dispossessed of privileges short of being fired. *Ramsey v. Board of Educ.*, 844 F.2d 1268, 1274 (6th Cir. 1988). Property interests are created by state law or "existing rules or understandings," not the Constitution, and employment privileges can become property interests when they are sufficiently secured as to be legitimate entitlements. *Town of Castlerock, Colorado v. Gonzales*, 545 U.S. 748, 756 (2005) ("To have a property interest in a benefit a person must clearly have more than an abstract need or desire and more than a unilateral expectation of it. He must have a legitimate claim of entitlement to it."). Each of Plaintiff's alleged property interests will be considered in turn.

A. Pay Increases

A constitutionally protected property interest will not lie in the outcome of an employer's discretion. *Richardson v. Township of Brady*, 218 F.3d 508, 517 (6th Cir. 2000) (holding that the plaintiff "can have no legitimate claim of entitlement to a discretionary decision."). For that reason, a public employee does not have a property interest in a procedure that may provide a merit-based pay increase. *Swartz v. Scruton*, 964 F.2d 607, 610 (6th Cir. 1992) (holding that merit pay that is based "on multiple layers of contingency" cannot form the basis of a due process claim). Multiple layers of contingency are exactly what governs pay increases at the University of Michigan, however, whose Faculty Handbook provides that pay

increases are made pursuant to a series of discretionary recommendations and decisions. (Defs.' Ex. 8). Plaintiff therefore does not enjoy "a legitimate claim of entitlement to a merit pay increase per se." *Swartz*, 964 F.2d at 610.

B. Sabbatical Time

Sabbatical leave, on the other hand, may rise to the level of a legitimate claim of entitlement. The handbook indicates that an application for leave must be made, but it is at least ambiguous as to the level of discretion invoked. (Defs.' Ex. 9). Further, Defendants have made no showing that there is a discretionary function to a professor's accumulation of sabbatical equity. Sabbatical leave and equity may rise to the level of constitutionally protected property interests. *See Ramsey,* 844 F.2d at 1274 (holding that an employee had a property interest in accumulated sick days).

C. Graduate Student Advisor Roles

If restrictions on Plaintiff's interactions with graduate students are only changes in job duties, her claim must be dismissed, for one does not have a property interest in one's job duties. Plaintiff has adequately alleged, however, that her role as an advisor to graduate students is necessary to her scholarship and her standing in the academic community. A change of job duties can be something much more when it both stigmatizes the employee and forces her to work beneath her station. The Sixth Circuit has held that a demotion may touch upon a constitutionally protected property right, but "the contours of that interest depend, of course, on the terms of

the contract." *Sharp v. Lindsey*, 285 F.3d 479, 489 (6th Cir. 2002). There are fact questions as to the nature of Plaintiff's tenure contract, the scope of her employment, and the extent to which her professorship relies on graduate students. But Plaintiff alleges that mentoring graduate student is necessary to continue her research, receive grants, engage in scholarship, and maintain standing in academia.

Plaintiff has therefore pled the deprivation of a constitutionally protected property interest in her sabbatical leave and graduate student mentorship. The question then becomes whether the process provided by the University is sufficient under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).

*2. Did the University's disciplinary process satisfy the requirements of the Fourteenth Amendment?*

Due process is "a flexible concept that varies according to the situation." *Sharp*, 285 F.3d at 487. Courts are to consider the competing interests of the parties, specifically the seriousness of the claimant's deprivation, the burden on the public entity, and the risk of erroneous outcome. *Matthews v. Eldridge*, 424 U.S. 319 (1976). "The fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 334.

Plaintiff had many opportunities to be heard in this case, but none were meaningful. Plaintiff was cleared of sexual harassment charges (SPG 201.89) by the OIE investigation. She was then retried by an LSA Faculty Executive Committee and given only the chance to submit further documentation in writing. After

Defendant Martin, with the Committee, imposed sanctions on the Plaintiff, she brought her complaint before the GHB. At the grievance board stage she was provided a hearing, and only then it was revealed that she was being tried for violating SPG 201.96, whose operative language is nearly identical to SPG 201.89. Neither party can identify the standard of review by which the GHB evaluated Defendant Martin's decision. Whether or not the GHB could even constitute a meaningful opportunity to be heard thus remains to be discovered.

The GHB hearing suffered from two further shortcomings. First, Plaintiff challenged the credibility of her accusers but was denied an opportunity to cross examine them. The Sixth Circuit very recently emphasized the importance of cross examination to university disciplinary proceedings. *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018). Plaintiff's inability to challenge her accusers' credibility was complete: their identities were undisclosed.

Second, Plaintiff alleges that she did not receive notice of the charges against her until halfway through the hearing. Plaintiff's inability to prepare a defense to the charges levied against her is troubling. *See Loudermill*, 470 U.S. at 542 (holding that a pre-deprivation hearing must be preceded by notice). Both of these shortcomings compound the inherent unfairness of charging Plaintiff twice for the same conduct after she was acquitted the first time.

Plaintiff has thus adequately pled that the University deprived her, without due process, of her constitutionally protected interests in her sabbatical leave and her graduate student advisorship.

## II. Unconstitutional Vagueness and Overbreadth

Plaintiff challenges SPG 201.96 as facially overbroad and vague. The policy, which applies only to faculty, provides that certain conduct may be sanctioned.

> "These behaviors include oral, written, visual, or physical actions by a member of the faculty that, according to a reasonable person standard:
> a) Have the purpose or effect of unreasonably interfering with an individual's employment or educational performance; and/or
> b) Have the purpose or effect of creating an intimidating, hostile, offensive or abusive climate for an individual's employment, academic pursuits, living environment, or participation in a University activity."

SPG 201.96(II).

Application of the overbreadth doctrine is "strong medicine," and should be used by courts "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Courts should not invoke facial overbreadth when a limiting construction could save the challenged rule, so SPG 201.96 will be construed to avoid, not invite, constitutional invalidation. *Id.*

*1. First Amendment Overbreadth*

Plaintiff argues that SPG 201.96 is overbroad and suppresses speech otherwise protected by the First Amendment. Courts have long recognized that "where a vague statute abut[s] upon sensitive areas of basic First Amendment

freedoms, it operates to inhibit the exercise of [those] freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972); *see Broadrick*, 413 U.S. 601, 611 ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.").

The question is whether SPG 201.96's potential reach encompasses a substantial amount of protected speech. *Houston v. Hill*, 482 U.S. 451, 459 (1987). The Court must consider the regulation or statute in relation to both the protected and unprotected speech it threatens. *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003). A policy will not survive First Amendment scrutiny if it sweeps within its ambit a substantial amount of protected speech along with that which may be legitimately proscribed. *NAACP v. Button*, 371 U.S. 415 (1963).

For instance, the court in *Doe v. University of Michigan*, 721 F.Supp 852 (E.D. Mich. 1989), found that the University's policy against racial stigmatization was overly broad. The University had forbidden racist speech that "[c]reated an intimidating, hostile, or demeaning environment" for university activities. *Id*. That policy, however, applied to students, contained no "reasonable person standard," and was aimed at suppressing a particular viewpoint. SPG 201.96, by contrast, applies to faculty, invokes a reasonable person standard, and is viewpoint neutral. Each of these distinctions is critical.

Universities may undoubtedly hold their faculty to more exacting standards of professionalism than the First Amendment would allow for students. *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995) (holding that "the University has a right to hold [a coach] to a higher standard of conduct than his players."); *Parate v. Isibor*, 868 F.2d at 827 (6th Cir. 1989) (holding that universities may sanction professors "whose pedagogical attitudes and teaching methods do not conform to institutional standards."). As a result, public universities may restrict their employees' speech in a manner that would be impermissible absent the employment relationship. Though a basketball coach may have a right to use racially offensive language in his private capacity, he has no such right in his professional capacity. *Id.* at 1183-84 ("An instructor's choice of teaching methods does not rise to the level of protected expression."); *see also Bonnel v. Lorenzo*, 241 F.3d 800, 820 (6th Cir. 2001) ("Plaintiff may have a constitutional right to use words such as 'pussy,' 'cunt,' and 'fuck,' but he does not have a constitutional right to use them in a classroom setting where they are not germane to the subject matter."). Since university professors enjoy what is in effect a captive audience, students lack recourse to the age-old expedient of walking away from offensive speech. *Id.*

The policy in dispute is aimed at of promoting "an environment of trust, openness, civility, and respect." SPG 201.96(I). These are goals which are acceptable for the government as a university employer just as they would be

unacceptable for the government as a sovereign. *See Bonnel*, 241 F.3d at 823-824 ("[C]olleges and Universities are legally required to maintain a hostile-free learning environment and must strive to create policies which further that purpose."). Courts have been very clear, however, that Professors do not "leave their First Amendment rights at the campus gates." *Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 594 (6th Cir. 2005). As a result, universities must balance their interests in creating a healthy academic environment against their professors' traditional academic liberties. *Bonnel*, 241 F.3d at 823-824 ("While a professor's rights to academic freedom and freedom of expression are paramount in the academic setting, they are not absolute to the point of compromising a student's right to learn in a hostile-free environment."). The right balance should "nurture and preserve a learning environment that is characterized by competing ideas, openly discussed and debated." *Id*. *quoting* Arthur L. Coleman & Jonathan R. Alger, *Beyond Speech Codes: Harmonizing Rights of Free Speech and Freedom from Discrimination on University Campuses*, 23 J.C. & U.L. 91, 98-99 (1996). This tension is also written into the policy of SPG 201.96, which places value on both "open discourse and exchanges that may cause some of its members to feel uncomfortable" and the expectation that its members "engage each other in a professional manner, with civility and respect." SPG 201.96(I). Civility of discourse and openness of discourse are ideals in opposition as much as they are in concert, but the task of calibrating this

balance is best left to the University. *Parate*, 868 F.2d at 825 ("the administration of the university rests not with the courts, but with the administrators of the institution."). Courts will only intervene where administrators go too far and begin to undermine the First Amendment.

This is not an occasion for such intervention. Although public universities may not force professors to endorse or eschew specific viewpoints, the First Amendment does not bar a public university from requiring that its faculty treat each other and their students with civility. *Johnson-Kurek*, 423 F.3d at 596 ("The freedom of a university to decide what may be taught and how it shall be taught would be meaningless if a professor were entitled to refuse to comply with university requirements whenever they conflict with his or her teaching philosophy."). The Court declines to interfere with the University's balancing of professorial freedom with its expectations of professionalism.

2. *Vagueness*

Plaintiff pleads that SPG 201.96 fails to meaningfully define the conduct it forbids. The Sixth Circuit has defined vagueness as follows.

> "A vague ordinance denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement."

*Dambrot,* 55 F.3d at 1183-1184.

A University policy is impermissibly vague where it provides no principle for distinguishing between sanctionable speech and protected speech. *Doe*, 721 F.Supp at 866. While SPG 201.96 might fail to provide notice to the "students of common understanding" that the *Doe* court was concerned about, faculty members can fairly be expected to have a more sophisticated grasp of professional codes of conduct. Further, the "reasonable person standard" provides an objective standard for faculty members who may be concerned when their behavior is crossing a line. *See Gaughan v. City of Cleveland*, 212 Fed. Appx. 405, 412-13 (6th Cir. 2007) (holding that courts have recognized that a reasonable person standard, when applied to qualifying offensive speech, "creates an objective standard against which the ordinance can be enforced."). Further, the many examples of prohibited conduct also serve to put staff members on notice of what conduct is expected of them. See SPG 201.96(III). The University is not asking too much of its faculty by requiring that they exercise reasonable due care not to hinder the work and study of their peers and students.

The next question is whether the policy carries the risk of providing "an unrestricted delegation of power to law enforcement officers." *Dambrot*, 55 F.3d at 1183-84. This concern is vitiated by the use of the "reasonable person standard" in conjunction with the peer review process required before the imposition of sanctions.

> "Prior to the imposition of any significant sanction or disciplinary action, to ensure that a level of peer review has occurred, the administrator shall consult with a relevant faculty executive or advisory committee…The

faculty who provide the peer review should look at the totality of the circumstances and not just the precipitating event."

SPG 201.96(III).

The risk of capricious official action is naturally reduced when decision-making responsibility is shared between peers tasked with arriving at a shared conception of reasonableness. That this policy may not have been followed in the instant case animates Plaintiff's due process claim, but a single failure to follow procedure will not invalidate the whole policy. Further, the statute does not baldly prohibit hostility, intimidation, offensiveness, or abuse; it prohibits creating a climate marked by any of those four descriptors, which speaks to a requirement that respondents' conduct be evaluated in a broad context.

Plaintiffs have not carried their burden to demonstrate that SPG 201.96 is constitutionally overbroad. University of Michigan faculty members need not fear that their First Amendment rights are impermissibly crimped, and they have ample notice as to the standards of professionalism expected from them.

### III. Free Speech Retaliation

Plaintiff pleads that she was disciplined for speaking on matters of public and academic concern. She maintains that discussions with her graduate students were undertaken pursuant to her role as a Professor of Sociology and Demography with a professional interest in discussing human sexuality. Her speech will only be protected if it is truly of public concern. *Connick v. Myers*, 461 U.S. 138 (1983).

Whether a Professor's speech is protected depends on whether the speech falls within the academic marketplace of ideas. *Dambrot*, 55 F.3d at 1189; *see also Parate*, 868 F.2d at 825 (holding that a university violated the First Amendment when it compelled a Professor to change a grade he assigned to a student). Academic freedom is "both the freedom of the academy to pursue its end without interference from the government…and the freedom of the individual teacher to pursue his ends without interference from the academy." *Parate*, 868 F.2d at 825, citing *Piarowski v. Illinois Community College Dist*. 515, 759 F.2d 625, 629 (7th Cir. 1985). These two freedoms are often in conflict. *Id*. The test for the Court is "the extent to which the [faculty member's] speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Dambrot*, 55.F3d at 1189.

Plaintiff, however, does not plead any facts that would support a finding that her speech advances ideas transcending personal interest. She argues that she has been sanctioned for "feminist informed conversations of the subject matter" of sexuality (Compl. ¶ 145), but she describes such conversations only in the most general terms, The OIE investigation's specific findings on what the Plaintiff is alleged to have said do not help her case (Defs.' Ex. 1). Even though it is not clear exactly what speech led to Plaintiff's sanctioning, the Court has not found any speech in the record that would be protected as touching upon a matter of public or academic concern. Personal sexuality is not public concern, even for a Professor of Demography.

## SOVEREIGN IMMUNITY

The Board of Regents of the University of Michigan is a department of the state and is thus protected by the Eleventh Amendment. *Estate of Ritter v. University of Michigan*, 851 F.2d 846 (1988). The Eleventh Amendment is not an absolute bar, however. Plaintiffs remain free to sue state employees in their official capacity seeking equitable relief. *Thiokol Corp v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993). Eleventh Amendment immunity from suit has also been waived by Congress to permit liability for deprivation of rights by public employees. 42 U.S.C. § 1983.

Plaintiff also does not, however, make out a case against Mark Schlissel or the Board of Regents. There is no suggestion on the record that either had any role in the discipline of Professor Smock. Section 1983 liability will attach to a supervisor only where is a "direct causal link" between the supervisor and the acts of subordinates giving rise to liability. *Hays v. Jefferson County*, 668 F.2d 869, 872 (1982).

## CONCLUSION

Only the due process component of the Complaint, Count I, will survive the motion to dismiss, and only as to Defendants Dean Martin and Provost Philbert. Plaintiff has adequately pled that the University violated her Fourteenth Amendment rights by sanctioning her under SPG 201.96. However, she has not carried her burden

for making out a constitutional challenge to SPG 201.96. Nor has she adequately pled that her sanctions constituted retaliation against her exercise of protected speech.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss [25] is **GRANTED IN PART AND DENIED IN PART**. Counts II and III of Plaintiff's Amended Complaint [23] are dismissed, and Mark Schlissel and the Board of Regents of the University of Michigan are dismissed as Defendants.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [17] is **DENIED**.

**SO ORDERED.**

Dated: November 19, 2018

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge